## DEVEREUX v. FLEMING, (DEVEREUX, Intervener.)

(Circuit Court, D. South Carolina. December 30, 1892.)

1. WAREHOUSEMEN—IMPLIED CONTRACT OF STORAGE—EVIDENCE.

The father of a resident member of a firm, presumably from the personal interest which he took in the firm's success on account of his son's connection therewith, caused a warehouse to be built at his own expense, in immediate connection with a system of railroads, thus facilitating the handling, delivery, and storage of the bulky and heavy articles which the firm dealt in. During the building of the warehouse the son wrote numerous letters to his partner, using expressions which would indicate that the warehouse was being built by the firm, and was of an inexpensive character, and that it would reduce the expense of the goods stored therein to the cost of handling only. The father, however, had no financial interest in the firm, never authorized such statements, and was ignorant of them. He made his son superintendent of the warehouse, and, the firm having stored large quantities of goods therein, the business of the two concerns became somewhat mixed. No contract was made as to the terms of the storage, and, although the father had several settlements with the firm as to other matters, he never said anything in regard to the charges for storage, but he regularly entered such charges on his own books. A receiver, having been appointed for the firm, attempted to remove the stored goods, whereupon the father claimed a lien for storage. *Held*, that the presumption that a man intends to obtain remuneration for the use of his property was not overcome by these facts, and it must be held that there was an implied contract of storage.

2. SAME—CHARGES.

Under the circumstances the firm should be allowed the best rates given by other warehouses of equal capacity and facilities.

3. SAME—LIEN FOR GENERAL BALANCE DUE FOR STORAGE.

The father as warehouseman was entitled to a lien on goods remaining in the warehouse for a general balance of storage due on all goods stored under the implied contract, for a warehouseman is entitled to a lien for such general balance for all goods stored under a single contract.

4. SAME—LIEN—GOODS RETAINED—CONTINUANCE OF STORAGE.

A warehouseman who retains goods for a general balance of storage under a single contract is entitled to storage at the same rate after the time of asserting his lien until payment is made, and he cannot be deprived of the same on the theory that the storage from that time on is for his own benefit. Somes v. Shipping Co., 8 H. L. Cas. 338, distinguished.

In Equity. Suit by John H. Devereux, Jr., against Howard Fleming, for the dissolution of the firm of Devereux & Fleming. A receiver was appointed, an accounting ordered, and creditors called in. J. H. Devereux, Sr., intervened by petition, setting up the claim for an unpaid balance on a storage contract. Subsequently, on defendant's (Fleming's) application, the assets of the concern were ordered transferred to him by the receiver, the former giving bond for the payment and satisfaction in full of all creditors holding proper claims against the firm. See 47 Fed. Rep. 177. Intervener's claim sustained.

F. J. Devereux, for petitioner.
J. N. Nathans, for defendant, Fleming.

SIMONTON, District Judge. The bill in the main cause was filed for the dissolution of the firm of Fleming & Devereux, a copartnership account, and the appointment of a receiver. The receiver was

appointed, the taking of the account was ordered, and creditors were called in. The business of the firm was as dealers in building material, lime, cement, plaster, and articles of like nature. Their warehouses were at 276 East Bay, and on Palmetto wharf, in the city of Charleston. The railroads entering that city not having at that time immediate access to the water front, J. H. Devereux, the elder, established wharves and a warehouse on land of his property on Ashley river. By personal influence and effort, he obtained a connection with the South Carolina Railway track, and in this way put his warehouse within the system of railroads meeting at Charleston. He named his wharves and warehouse the "West Shore Terminal." When this enterprise was nearly, if not altogether, completed, Fleming & Devereux made use of the West Shore Terminal by storing a large part of their stock in the warehouse, and by using the wharves for the receipt and delivery of cargoes. Thus they saved on shipments into the interior the cost of drayage on goods to the railroad depots. In all, there were shipped to the West Shore Terminal by this firm 23,432 barrels, of which 19,230 went into the warehouse and the remainder, 4,202, were delivered and shipped from the wharf. When the receiver was appointed in the main case, he, under an order of this court, attempted to remove the goods from this warehouse. He removed a part of them, but Mr. Devereux, the elder, refused to permit the removal of some 996 barrels, claiming that there was due to him a general balance of warehouse charges. He thus set up and enforced his lien. No further steps were taken by the receiver, either by way of paying this balance, or admitting and tendering any part thereof, or in attempting to remove the goods. Mr. Devereux, the elder, then intervened in this cause, by filing his petition setting up his lien, stating his account, and praying its payment. This was referred to a special master—

"To take an account of the dealings and transactions of and between the said John H. Devereux, the elder, as warehouseman, and the firm of Fleming & Devereux, and to state what upon the balance of account between them shall appear to be due; and the said master is authorized to report and state to the court any special circumstances needful for explaining said account in his report thereof."

The testimony was taken before the master under this order, and is before the court.

John H. Devereux, the younger, a member of the firm of Fleming & Devereux, is the only son of Mr. Devereux, the elder. He was quite a young man when he went into the firm,—bright and energetic. His entrance into this firm was an important and valuable event in his life. Necessarily and naturally his father was proud of this promotion of his only son, and took a deep personal interest in the welfare and business of the firm. When he conceived and projected the scheme of the West Shore Terminal, one of the promoting, if not the inducing, reasons for the enterprise was the great facility and advantage a warehouse in immediate contact with the whole railroad system would give to this firm, dealing, as it did, in heavy and bulky articles. In this day of fierce and relentless competition, the saving of drayage across the city on goods shipped may have saved a profit

on sales. Before the inception and during the progress of the work he conferred with both members of the firm. His son took a deep and active interest in the construction of the terminal, and when the warehouse was completed his father made him the superintendent. While the construction was going on, young Devereux wrote many letters to his copartner, who is a nonresident. The evidence does not disclose any knowledge on the part of the elder Devereux of the contents of these letters. He did know that the correspondence was constant. The tone and tenor of these letters would justify the opinion that the firm was building the warehouse, which was to be of an inexpensive character. From expressions used in his letters one could believe that young Devereux supposed it was designed exclusively for the firm's use, and that it would reduce the expense on the goods stored therein only to the cost of handling. On this correspondence, Mr. Fleming, to whom the property and assets of the firm have been delivered, and who must pay its debts, insists that John H. Devereux, the elder, has no claim for storage; that it never was his intention to charge storage; and that this correspondence written by his son and superintendent prove this.

The facts are that John H. Devereux, the elder, was at the whole cost of the wharves and warehouse; that the only thing furnished by the firm was the tin which covered the warehouse, and that for this he promptly paid them; that the warehouse is a substantial structure, on a large wharf, the whole covering over two acres of valuable land, having a railway connection over his farm, granted gratuitiously. The cost has been $20,000. The elder Devereux had no business interest in or connection with the firm, and shared no part of its profits. He had an interest in its successful conduct and well being; but this was entirely sentimental. When one has the use of the property of another under no express contract or agreement, the law presumes a contract for hire quantum valebat. This legal presumption must be rebutted by proof. There is no evidence that the elder Devereux ever stated or authorized the statement that no charge would be made for storage to Fleming & Devereux; none whatever that he ever contracted to make no charge, or offered special inducements for the removal of their goods to, or the storage of them in, the warehouse. Mr. Fleming is a man of business, of New York city, of large experience, and, as his testimony discloses, of no ordinary ability. He knows that to give something for nothing is not the usage of the business world. If from expressions in the letter of his young partner he saw an indication that perhaps his father would allow the firm the use of the warehouse gratis, his experience and educated commercial instinct would have impelled him to have this important concession "in black and white." It appears now that there never was any bill presented for storage; but the charges were duly entered by the agent of Mr. Devereux, the elder, not by his son. It also appears that in one or more settlements made by the elder Devereux with the firm for moneys borrowed and for goods purchased, no allusion was made by him to any set-off by him of the storage account; and also it seems that, from the dual position young Devereux occupied, the business of the warehouse and

that of the firm were a good deal mixed. It is impossible, after reading the evidence in this case, to come to any other conclusion than that the warehouse business was conducted in an unbusinesslike way. Beside this, young Devereux, in his firm's affairs, seemed always to be hard pressed. He had notes to meet and goods to sell and collections to make, and was always anxious, hard up, and embarrassed. Under these circumstances, it is reasonable to suppose that his father would not add to his embarrassment by pressing his claim for storage; and that, on the contrary, he would suffer inconvenience himself, and, further, would aid him with money when he could. It will require more than the evidence in this record to rebut and remove the presumption that a man is entitled to be paid for the use of his property.

There is no direct evidence of the terms upon which the goods were to be stored. In fact nothing was ever said about terms. The petition claims full rates of storage. It appears from the printed rate of several warehousemen and from parol evidence that the charge is six cents per package for the first month, and four cents for each succeeding month or parts of a month. It also clearly appears that in actual practice these are maximum rates, and that the usage is not to abide by them if business can be secured by abatement of price. The circumstances of this case are special in their character. Fleming lived in New York. Young Devereux was the resident, active, managing partner. He was at the same time superintendent of the warehouse. As partner, he was bound to get the best rates for his firm. Full rates are never charged unless special rates are not made. It was his duty to get special rates. If he dealt with himself as representing the warehouse, this made it still the more imperative on him to make special rates. If he dealt with his father, the latter, an honest man, never would consent that his son should not act on the line of his duty. If the subject had been mentioned between them, he certainly would have advised his son to seek and demand those terms which are invariably conceded to a large and valuable and steady customer. There being no express contract, the court must fix the charge, and will do so following this broad rule of equity. To Fleming & Devereux the best terms should be conceded; that is to say, such terms as a warehouseman of equal capacity and equal facility would concede. We find that the rate of charge of the East Shore Terminal, whose capacity and facilities are equal to those of the West Shore Terminal, charges six cents for the first month on each package, and two cents for each subsequent month and parts of a month. This must be the rate allowed here. The charge of six cents for the first month is made up by two cents for wharfage, two cents for handling, and two cents for storage. Of the 23,432 packages delivered near the warehouse 19,230 went into it, and are subject to the rates hereinbefore fixed; 4,202 did not go into the warehouse, but were shipped. They are liable only for the two cents wharfage and two cents for handling.

The next question is as to the period during which the charge for storage is to be allowed. The petitioner asserted his lien on 9th June, 1891, and under this lien withheld the delivery of 996 barrels. He

still holds them. He claims the amount due for general balance on the 9th June, to wit, $1,795.12, and the storage on the packages held by him up to the present time. The contract of a warehouseman with his customer is to receive and keep and deliver to order goods placed in his custody on payment of the lawful charges therefor. He has a lien at common law; a specific, not a general, lien. The lien is upon the goods stored for the particular charge on such storage; but if the goods were received under one transaction, and form a part of the same bailment, he may deliver a part of the goods, and retain the residue for the price chargeable on all the goods received, provided the ownership of the whole is in one person. Jones, Bailm. §§ 967, 974. This phrase "under one transaction" does not mean at the same time, but pursuant to one contract. In the present case we assume that the goods were warehoused under a contract and on terms covering all bailments of Fleming & Devereux. This brings the case within the rule stated allowing the detention of some of the goods for a balance due on all. It is contended with great earnestness and plausibility that, when a warehouseman enforces his lien and refuses to deliver on demand, his custody thenceforward is not under his contract of warehouseman, and for the use and benefit of his customer, but his own protection and benefit. He then has no further right to charge storage. The text-book (Jones, Liens, § 972) and the cases quoted (especially Somes v. Shipping Co., 8 H. L. Cas. 338) do not sustain this proposition so broadly stated. Where one is placed in possession of a chattel to do some work on it, and refuses to deliver it when completed until he is paid, he cannot charge storage of that chattel while he is enforcing his lien, because the original contract for repairing and the subsequent implied contract for storage are entirely distinct and separate; but in a case like the present, when the contract is that of storage, and the contract is for the delivery on payment of charges, the right to hold the goods under the original contract does not cease until those charges are paid, released, or tendered. This seems to be the law of this case. As no tender or offer to pay has been made, the warehouse charges still go on.

The special master simply reported the testimony. This opinion fixes the rule upon which the accounts can be made up. Let the case be recommitted to the special master, for a statement of the account upon these principles, allowing all proper credits; and let him report the result.